**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA**

---

|  |  |  |
|---|---|---|
| JACKSON NATIONAL LIFE INSURANCE COMPANY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No.: |
| | : | |
| STERLING CRUM, | : | |
| | : | |
| Defendant. | : | |

---

## COMPLAINT

Plaintiff, Jackson National Life Insurance Company ("Jackson"), by and through its attorneys, Miller & Martin, PLLC, hereby files this Complaint for Declaratory Judgment and, in support thereof, alleges and states as follows:

### INTRODUCTION

1.      This is an action for declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201, stemming from the procurement of a $500,000 insurance policy (the "Policy") on the life of Kelly Douglas Couch ("Mr. Couch").

2.      Jackson is entitled to the relief it seeks because it is unclear whether the Policy was an illegal human life wager and lacked an insurable interest at inception.  Specifically, the facts and circumstances surrounding the application and procurement of the Policy raise issues concerning (i) whether there was an agreement or understanding made, prior to when the Policy was issued, for it or an interest in it to be assigned or sold in a secondary market; (ii) whether the Policy was procured for the purpose of assigning or selling it (or an interest therein) to an entity having no insurable interest in the life of Mr. Couch; (iii) whether the Policy was intended to

protect against an actual risk of loss facing anyone associated with Mr. Couch in the event of his death; (iv) whether the Policy was procured by, or at the behest of, an entity having no insurable interest in the life of Mr. Couch; (v) whether Mr. Couch paid the premiums on the Policy; and (vi) whether the individual who completed the Policy application is the same individual who died on June 10, 2005.

3.      Jackson therefore seeks equitable relief in the form of a declaration regarding whether the Policy is void *ab initio* because it was an illegal human life wager and was unsupported by a valid insurable interest at issuance.  Jackson further seeks a declaration as to whether any premiums are refundable on the Policy and, if so, whether it is entitled to offset any return of premiums against the costs and other losses it incurred in connection with the Policy.

## PARTIES

4.      Plaintiff, Jackson, is an insurance company, incorporated and existing under the laws of Michigan, with its principal place of business in Michigan.  Jackson is a citizen of Michigan for purposes of diversity jurisdiction.

5.      Upon information and belief, Defendant, Mr. Crum, is a natural citizen, residing in Washington.  Mr. Crum is a citizen of Washington for purposes of diversity jurisdiction.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, because the claims arise under the laws of the United States, particularly the Declaratory Judgment Act, 28 U.S.C. § 2201.  This Court also has jurisdiction under 28 U.S.C. § 1332(a)(1), because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and there is complete diversity between Plaintiff and Defendant.

7.     Venue is proper in the District of Georgia, because a substantial part of the events giving rise to each of the claims occurred in Georgia.  Among other things, the Policy was applied for in Georgia through a Georgia broker; the application was signed in Georgia; and the policy was delivered in Georgia.

## FACTUAL BACKGROUND

### A.     The Viatical Industry

8.     The viatical industry emerged in the late 1980's and early 1990's as a means for terminally ill policyholders, principally those suffering from AIDS, to convert their life insurance policies – assets that were otherwise allegedly useless to them during their lifetimes – into cash by selling them on a secondary market.

9.     Effectuated properly, viatical transactions can be legal.  However, over the years, crooked secondary market investors have created illegal viatical schemes whereby they solicit terminally ill patients to commit insurance fraud by permitting stranger investors to place life insurance policies on their lives with the understanding and/or expectation that the policies will be later sold on the secondary market.

10.     There has been significant litigation in connection with these schemes.  Much of this litigation seeks to invalidate policies that were subject to "clean-sheet" and/or "wet-ink" strategies, which are typically designed to defraud insurance companies into issuing policies on individuals with poor health and/or policies that will be sold on the secondary market.

11.     Clean-sheeting is intended to induce insurers to issue policies on insureds that otherwise would not be able to obtain insurance.  In a clean-sheeting scheme, an applicant (sometimes in cooperation with the secondary market investor) conceals that they are terminally or chronically ill, or that their health is otherwise compromised, by lying about their health on

the insurance application and/or submitting medical records or test results from a healthy person rather than the applicant.  These schemes allow the viatical companies to create an inventory of policies for sale on the viatical market.

12.     Wet-ink schemes (often used in conjunction with clean-sheet schemes) occur when the applicant agrees to sell the fraudulently procured policy at or near the time of issuance, while the ink is metaphorically "still wet" on the policy.  Because the sale of a life insurance policy soon after issuance could raise a "red flag" to the insurance company, unscrupulous viatical settlement providers often hide wet-ink transactions by not disclosing any evidence of the transfer until after the expiration of the contestability periods.

**B.     The Couch Policy**

13.     In 1998, the Midland Life Insurance Company ("Midland") received an application seeking $500,000 in life insurance coverage on the life of Mr. Couch (the "Application").  A copy of Part 1 of the Application is attached at **Exhibit A**.  Mr. Couch's social security number is listed as ████ 8600 on the Application.

14.     The Application listed "ESTATE OF INSURED" as the beneficiary of the proposed Policy.  An estate named as the beneficiary is now known to be a common characteristic of policies procured for sale in the Secondary Market, especially where the insured has no spouse or children.  During the claim review process Jackson learned that, at the time of his Application, Mr. Couch was only 32 years old with no spouse or children.

15.     The Application further listed Mr. Couch's address as ██████████████ ████ Atlanta, GA ████ and Mr. Couch's occupation as "RESIDENTIAL CLEANING SERVICE."

16.     The Application also asked in Section 11, entitled Annual Income, "[i]n the past 7 years, have you filed for bankruptcy?"  Mr. Couch answered "No."  However, upon information and belief, on October 25, 1993, Mr. Couch filed for Chapter 13 Bankruptcy in the Southern District of Georgia.  *See Douglas K. Couch*, Case No. 4:93-bk-41843 (S.D. Ga. Oct. 25, 1993). Further, upon information and belief, on March 30, 1992, Mr. Couch filed for Chapter 7 Bankruptcy in the Middle District of Florida.  *See Kelly Douglas Couch*, Case No. 3:92-bk-01776 (M.D. Fla. Mar. 30, 1992).

17.     The Application indicated that the premium notices should be sent to the proposed insured and that the premiums would be paid by monthly pre-authorized checks.

18.     On January 17, 1999, Midland issued Policy No. Z13041, a 10-year term Preferred Plus policy, to Mr. Couch insuring his life with a face amount of $500,000.

19.     Mr. Couch selected to pay the annual premium of $250.00 on a monthly basis in the amount of $22.50.

20.     On September 20, 1999, Midland received by facsimile a Beneficiary/Ownership Change Form ("Change Form") purportedly sent by Mr. Couch.  A copy of the Change Form is attached hereto as **Exhibit B**.

21.     The Change Form requested that Midland change the primary beneficiary of the Policy to Sterling Crum at an address of ████████████Kirkland, WA ████, and the secondary beneficiary to Estate of Sterling Crum at the same address.  Mr. Crum's relationship to the insured was listed as "Friend," and the Estate's relationship was listed as "Friend's Estate."

22.     The Ownership portion of the Change Form was left blank.

23.     The Change Form was purportedly signed by Mr. Couch on August 31, 1999. Midland effectuated the Change Form on September 22, 1999.[1]

24.     The facsimile line at the top of the Change Form reads:

*Sep 20 99 03:47p*           *Keith Thomas*           *954-565-8782*

25.     Upon information and belief, area code 954 is associated with the Fort Lauderdale, Florida area.

26.     Upon information and belief, Keith Thomas is the former President of the now-defunct viatical settlement brokerage Cash for Life, Inc. ("Cash for Life"), located in Fort Lauderdale, Florida.

27.     During its existence, Cash for Life was notorious for the purchase and sale of illegitimately obtained life insurance policies, later sold on the secondary market as viatical settlements.

28.     Upon information and belief, the Florida Department of Financial Services revoked Cash for Life's license to conduct business in the State of Florida between June of 2002 and March of 2003.

29.     On May 16, 2000, Jackson received correspondence purportedly from Mr. Couch enclosing a check in the amount of $160.00 for the remainder of the premium payments due through January 2001.  The correspondence further requested that the premium payments being made by automatic withdrawal from his checking account be discontinued and that billing for annual payments commence immediately.

---

[1] Subsequently, through a series of mergers and acquisitions, the rights and obligations of Midland under the Policy were assumed by Jackson.  Hereinafter, where the identity of the insurer is not relevant, Jackson is used in place of the name of the actual insurer responsible for the Policy at the time of the event described.

30.     The correspondence was received by Jackson in a FedEx envelope with a return address of Page Thomas (who upon information and belief is a relative of Keith Thomas and worked with Keith Thomas in connection with Cash for Life transactions) at 3471 N. Federal Hwy. 505, Ft. Lauderdale, FL 33306.

**C.      Mr. Couch Dies and the Policy Lapses**

31.     Mr. Couch died on June 10, 2005.  A copy of the Death Certificate is attached at **Exhibit C**.

32.     The Death Certificate lists Mr. Couch's social security number as ███-7981 ("7981"), which was different than the social security number listed for Mr. Couch on the Application.  The cause of death is listed as "respiratory failure, due to or as a consequence of sepsis, due to or as a consequence of pancreatitis."

33.     Notably, a search of the Death Master File was conducted by Jackson after Mr. Couch's death (but prior to Jackson learning of Mr. Couch's death) using the social security number provided on the Application.  Because that social security number is seemingly incorrect, Mr. Couch's death did not come up on the Death Master File search.

34.     For years, despite Mr. Couch's death, no claim was made on the Policy, and Jackson was not notified of the death.  In fact, Jackson continued to receive premium payments on the Policy through the end of 2009.

35.     On November 18, 2009, Jackson mailed Mr. Couch – who owned the Policy throughout its existence – notice that a premium increase would occur on January 17, 2010.

36.     Thereafter, premium payments ceased, and the Policy lapsed on or about February 18, 2010; on March 19, 2010, Jackson then sent Mr. Couch correspondence notifying him that the period for reinstating the Policy without providing evidence of insurability had ended.

37.     Jackson never received another premium payment on the Policy, nor correspondence requesting information about reinstating the Policy.

**D.     Jackson Receives a Claim on the Policy More Than 11 Years After Mr. Couch's Death**

38.     In January of 2017, counsel representing Mr. Crum contacted Jackson and informed Jackson of Mr. Couch's death for the first time.

39.     On January 6, 2017, Jackson sent Mr. Crum correspondence that explained its typical claim review process.  The correspondence requested that a completed copy of the enclosed Life Claimant Statement be submitted for Jackson's review, as well as a certified copy of the death certificate and the original copy of the Policy.   A blank copy of the Life Claimant Statement is attached hereto as **Exhibit D**.

40.     Page 1 of the Life Claimant Statement provides Instructions on completing the document.  The Instructions list the documents required for proof of loss, and indicate that special instructions and additional requirements may also apply.  Specifically, the Instructions state:

> If the policy is subject to a Viatical or a Life Settlement transaction, and if the beneficiary is a viatical settlement provider, life settlement provider, the receiver or conservator of viatical or life settlement company, a viatical or life financing entity, trustee, agent, securities intermediary or other representative of a viatical or life settlement provider or an individual or entity which invested in this policy as a viatical or life settlement, please complete the relevant questions.

41.     The Instructions further provide that "[o]ther requirements may be needed depending on the individual facts of the claim.  The company will advise you if other documentation is required."

42.     Page 2 of the Life Claimant Statement is entitled Fraud Instructions and provides specific information based on the residency of the claimant.  In relevant part, the Fraud Instructions provide:

**For Residents of Maine, Tennessee and Washington**:  It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company.  Penalties include imprisonment, fines and denial of insurance benefits.

43.     Jackson sent Mr. Crum follow-up correspondence reiterating its request for the Life Claimant Statement and other documentation on January 31, 2017 and February 23, 2017.

44.     Following several months of delay, under cover of letter dated March 17, 2017 from counsel for Mr. Crum, Jackson received a partially completed Life Claimant Statement and a certified copy of the Death Certificate.  A copy of the partially completed Life Claimant Statement is attached hereto as **Exhibit E**.

45.     On the Decedent Information portion of the Life Claimant Statement, Mr. Crum listed the last four digits of Mr. Couch's social security number as 7981, which were also the last four digits of the social security number listed on the Death Certificate, but were different than the last four digits of the social security number listed on the Application.  Mr. Crum further indicated the original copy of the policy was "lost or missing."

46.     On the Claimant Information portion of the Life Claimant Statement, Mr. Crum described his relationship to the deceased as "Benefactor."

47.     The Claimant Information portion of the Life Claimant Statement specifically requests information about whether the Policy had ever been subject to a viatical and/or life settlement transaction in question 19, which provides:

19.     **Policies subject to Viatical / Life Settlement transaction –** Are you a viatical settlement provider, life settlement provider, the receiver or conservator of viatical or life settlement company, a viatical or life financing entity, trustee, agent, securities intermediary or other representative of a viatical or life settlement provider; or an individual or entity which invested in this policy as a viatical or life settlement?

48.     Mr. Couch failed to answer question 19 of the Life Claimant Statement.

49.     The second page of the Life Claimant Statement provides the following

information about the importance of providing accurate information on the Life Claimant

Statement:

**Important Information about the USA PATRIOT Act**
To help fight the funding of terrorism and money-laundering activities, the U.S. government has passed the USA PATRIOT Act, which requires banks, including our processing agent bank, to obtain, verify and record information that identifies persons who engage in certain transactions with or through a bank.  This means that we will need to verify the name, residential or street address (no P.O. Boxes), date of birth and social security number or other tax identification number of all account owners.

**SUBSTITUTE FOR IRS FORM W-9**
This information is being collected on this form versus IRS form W-9 and will be used for supplying information to the Internal Revenue Service (IRS).  Under penalty of perjury, I certify that 1) the tax ID number above is correct (or I am waiting for a number to be issued to me), 2) I am not subject to backup withholding because (a) I am exempt from backup withholding, or (b) I have not been notified by the IRS that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, 3) I am a U.S. person (including a U.S. resident alien), and 4) I am exempt from Foreign account Tax Compliance Act (FATCA) reporting.  Please cross through item 2 if you have been notified by the IRS that you are subject to backup withholding because you have failed to report all interest and dividends on your tax return.  Cross through item 3 if you are not a U.S. person (including a U.S. resident alien) and complete and return to us if you are not a U.S. person (including a U.S. resident alien) and complete and return to us the applicable IRS Form W-8BEN-E.

50.     Finally, the Life Claimant Statement requires the signature of the Claimant.  The

signature box provides the following:

I/We do hereby make claim to said insurance, declare that the answers recovered above are complete and true, and agree that the furnishing of this and any supplemental forms do not constitute an admission by the Company that there was any insurance in force on the life in question, nor a waiver of its rights or defenses.

**For Residents of New York**:  Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to

a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

**For residents of All Other States**:   See the Fraud Information section of this claim form.

**The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.**

51.    Mr. Crum signed the Life Claimant Statement and dated it March 8, 2017.

**E.    Jackson's Review of the Claim and Discovery of Inconsistencies Between the Application, Death Certificate, and Life Claimant Statement**

52.    During its review of this claim, Jackson discovered that the social security number provided by Mr. Couch on the Application did not match the social security number for Mr. Couch that was provided by Mr. Crum on the Life Claimant Statement or the Death Certificate.

53.    Upon information and belief, the social security number provided in the Application was issued between 1936 and 1951 in Puerto Rico, which would mean that it could not be Mr. Couch's social security number because he was not born until 1966.

54.    Moreover, Jackson's research shows addresses in Georgia in March of 2008 and California in December of 2008 associated with the social security number provided in the Application.  Jackson's research also shows addresses in Maryland from February of 2010, as well as addresses in Florida and Georgia associated with the social security number provided on the Death Certificate.

55.    After discovering this information, Jackson contacted counsel for Mr. Crum to inquire about the discrepancy.  Rather than provide any legitimate explanation as to why Mr. Couch would use a social security number that was issued decades before he was born in Puerto Rico to apply for the Policy, counsel for Mr. Crum asserted, and continues to assert at the time of

filing, that it is commonplace for individuals to have multiple social security numbers associated with their name.

56.     Counsel further represented to Jackson that the premiums were paid well beyond Mr. Couch's date of death because Mr. Crum didn't communicate well with Mr. Couch.

57.     Jackson further discovered Mr. Crum failed to complete question 19 on the Life Claimant Statement regarding viatical and life settlement transactions.  In correspondence to Jackson dated June 15, 2017, counsel for Mr. Crum indicated that Mr. Crum wished to answer "no" to question 19 as written because "Mr. Crum received his interest in this policy in settlement of a business dispute and legal claim between himself and a viatical settlement company.  [Mr. Crum's] claim against them was for $295,000.00, and in lieu of the company paying cash to settle his claim, they offered the interest in this policy as a full and complete settlement of Mr. Crum's claim, which he subsequently accepted."

58.     Upon information and belief, the identity of that alleged viatical company is Cash for Life.

59.     Nevertheless, the supposed owner of the Policy was and always has been Mr. Couch, so it seems impossible that Cash for Life, or any other viatical settlement company, properly acquired ownership of the Policy such that it could be used as an asset to settle a legal dispute.

60.     The supposed beneficiary upon issuance of the Policy was Mr. Couch's estate, followed by Mr. Crum, so it seems impossible that Cash for Life, or any other viatical settlement company, legitimately acquired a beneficial interest in the Policy such that it could be used as an asset to settle a legal dispute.

61.    The Change Form purportedly completed by Mr. Couch indicated he and Mr. Crum were friends, not that the beneficiary interest was transferred as settlement of a legal claim between a third-party viatical company and Mr. Couch.

62.    Mr. Crum refuses to produce any documentation of the legal dispute, settlement agreement between himself and Cash for Life (nor any other life settlement company), or any evidence that Cash for Life ever held a valid interest in the Policy, despite repeated requests from Jackson.

63.    Mr. Crum has not provided an explanation for the discrepancies in the Life Claimant Statement, including why he listed his relationship to Mr. Couch as "benefactor" despite allegedly receiving his beneficial interest in the Policy through a settlement agreement.

## COUNT I

## DECLARATORY JUDGMENT – ILLEGAL HUMAN LIFE WAGERING CONTRACT

64.    Jackson hereby incorporates by reference each and every averment contained in the preceding paragraphs as if set forth herein at length.

65.    The Policy bears certain indicia of a life insurance policy procured for the purpose of wagering and resale on the secondary market, including but not limited to the following:

   a.    The application was for a $500,000 policy on a single 32-year-old man with no spouse or children with only his estate as the beneficiary;

   b.    Mr. Couch appears to have potentially used a fake social security number to apply for the Policy;

   c.    Mr. Couch lied about having had past bankruptcies in the relevant time period on the Application;

    d.   The beneficiary Change Form was completed only months after the Policy was issued;

    e.   The beneficiary Change Form was faxed from a number associated with an illegitimate viatical settlement company;

    f.   Mr. Crum's alleged beneficial interest was discovered within months after the issuance of the Policy, and Jackson is now told that this interest was acquired through a settlement with a viatical settlement company whose underlying viatical transaction with respect to the Policy was concealed from Jackson and its predecessors;

    g.   Mr. Crum provided untrue information on the Life Claimant Statement;

    h.   Mr. Crum can produce no legitimate explanation for the inconsistencies between the Application and other documents associated with the Policy; and

    i.   Mr. Crum refuses to produce any documents substantiating his claims about a legitimate settlement of an unrelated claim with an alleged viatical settlement company to clarify the inconsistencies.

66.    As set forth herein, it appears the Policy may have been, from the outset, intended as a wager on the life of Mr. Couch.  Whether Mr. Couch knew the details of this scheme or his identity was merely used as an instrumentality to procure the Policy, stranger investors may have been wagering on the Insured's life and hoping to trigger a secondary market cash-in on the Policy's $500,000 death benefit.

67.    Accordingly, Jackson seeks, and is entitled to, a declaratory judgment as to whether the Policy was an illegal wagering contract that violated Georgia law and public policy, thus rendering the Policy void *ab initio*, meaning that the Policy never came into existence.  If

this Court declares that Jackson is not required to pay the benefits of the Policy based on the documentation provided by Mr. Crum in support of his claim, Jackson seeks a further declaration regarding whether any premiums are refundable on the Policy and, if so, whether Jackson is entitled to offset any return of premiums against the costs and other losses it incurred in connection with underwriting, issuing, commission payments, administration, and claim processing on the Policy.

**COUNT II**

**DECLARATORY JUDGMENT – LACK OF INSURABLE INTEREST**

68.     Jackson hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

69.     As set forth herein, it appears that Cash for Life may have acquired its interest in the Policy by way of an underlying viatical transaction that was concealed from Jackson and its predecessors in an effort to hide that the Policy lacked insurable interest at the time it was issued.

70.     Moreover, the Policy may have been applied for and issued at the behest of individuals or entities – with no insurable interest in the life of the Insured – who procured the Policy for the purpose of benefitting stranger investors in the viatical secondary market. Accordingly, the Policy may be void *ab initio*.

71.     Therefore, Jackson seeks, and is entitled to, a declaratory judgment as to whether the Policy lacked insurable interest because it was procured by and for the benefit of strangers without any insurable interest under Georgia law, and was thus void *ab initio*.

**RELIEF REQUESTED**

WHEREFORE, Jackson respectfully requests the entry of an Order by this Court as follows:

a.      Declaring whether the Policy is void *ab initio* due to it having been procured as a wagering contract on the life of the Insured;

b.      Declaring whether the Policy is void *ab initio* due to it having been procured without a valid insurable interest at inception;

c.      Declaring whether the Policy is void *ab initio* and thus never existed;

d.      Declaring whether, because the Policy is void *ab initio* and never existed, the Change Form purporting to change the beneficiary of the Policy to Mr. Crum is void;

e.      Declaring whether, because the Policy is void *ab initio*, the Court will leave the parties to this illegal contract as it finds them, thus permitting Jackson to retain the premiums paid on the Policy, or, in the alternative, declaring that Jackson may retain some or all of the premiums paid on the Policy to effectuate an offset with respect to Jackson's costs and losses associated with underwriting, issuing, commission payments, administration, and claim processing on the Policy;

f.      Awarding Jackson attorneys' fees and costs associated with bringing this lawsuit, as determined by the Court; and

g.      Awarding Jackson such further relief as this Court deems appropriate.

Respectfully Submitted,


Dated: October 2, 2017          By:     /s/ James T. Williams
                                        MILLER & MARTIN, PLLC
                                        James T. Williams (No. 185084)
                                        Volunteer Building Suite 1200
                                        832 Georgia Ave.
                                        Chattanooga, TN 37402
                                        Telephone: (423) 785-8244
                                        Facsimile: (423) 321-1576
                                        james.williams@millermartin.com

                                        DRINKER BIDDLE & REATH, LLP
                                        Stephen C. Baker (*pro hac vice* motion to be filed)

16

Michael J. Miller (*pro hac vice* motion to be filed)
Jessica E. Loesing (*pro hac vice* motion to be filed)
One Logan Square, Suite 2000
Philadelphia, PA 19103
Telephone: (215) 988-2700
Facsimile: (215) 988-2757
stephen.baker@dbr.com
michael.miller@dbr.com
jessica.loesing@dbr.com

*Attorneys for Plaintiff,*
*Jackson National Life Insurance Company*